1
2
3
4
5
6
7
8                          IN THE UNITED STATES DISTRICT COURT

9                       FOR THE EASTERN DISTRICT OF CALIFORNIA

10   CURTIS HOWARD,

11              Petitioner,                    No. CIV-04-0083 DFL KJM P

12        vs.

13   SCOTT KERNAN,

14              Respondent.            FINDINGS AND RECOMMENDATIONS

15   _____/

16              Petitioner is a state prisoner proceeding with an application for writ of habeas

17   corpus under 28 U.S.C. § 2254.  Petitioner is currently serving a sentence of fifty-seven-years-to-

18   life in the California Department of Corrections and Rehabilitation.  Answer, Ex. B at 2.  A jury

19   convicted petitioner of first degree murder and found true the allegation that petitioner

20   discharged a firearm causing great bodily injury.  Id.  The same jury also convicted petitioner of

21   assault with a firearm and found true the allegation that petitioner used a handgun in committing

22   that offense.  Petitioner challenges his convictions and sentences.

23   I.  Background

24              Following his trial and sentencing, petitioner appealed to the California Court of

25   Appeal.  Answer, Ex. A.  The Court of Appeal summarized the facts related to petitioner's

26   convictions as follows:

Defendant Cherie Lee Forstein and her 13-year-old son Chad moved to the Franklin Villa apartment complex in the summer of 1999.  Conflicts arose with the neighbors, particularly between Chad and people she described as "the local gangsters."  Forstein reported numerous threats and assaults to the police.  She did not move out of the complex because she was unable to find a place that would accept Chad's Rottweiler.  Forstein told her mechanic, Dean Madeiros, and her employer, Frank Munoz, that she would bring in some muscle to deal with the neighborhood problems.[1]  She explained that her "ex" was a bail bondsman who lived in San Francisco.

Chad made friends with another teenager in the complex, the assault victim LaMarr.  The friendship soured when Chad lost his pager and accused LaMarr of taking it.  On another occasion, Chad sprayed - - or threatened to spray - - LaMarr with mace his mother had given him.

During the same period, Forstein had several confrontations with Wanda Frazier, LaMarr's mother.  After one incident, a friend informed Frazier that Forstein said she was going to "get one-eyed Jimmy and come back and kill" Frazier's children.  Another time, Forstein yelled at Frazier, mentioned a gun, and said she would not take "this bullshit."  She continued, "I'll kill all these mother fuckers."

On September 7, 8, and 9, 1999, Forstein left telephone messages for Chad's father, the 78-year-old defendant Curtis Howard.  She explained that Chad was in danger, and threatened to kill Howard if he failed to pay the money he owed so she could move.

On Monday, September 20, 1999, Forstein stopped LaMarr outside her apartment on his way from school.  She grabbed him by the collar, pushed him against a tree, and told him Chad's father was a bail bondsman with a lot of power.  Forstein said Chad's father knew someone named "one-eyed Jimmy," and other "crazy people," who would come to Sacramento and kill for him.  LaMarr testified the threats were directed toward his brother and father.

At that point, Frazier came out of her apartment across the alley, and the two women began yelling at each other.  During the argument Forstein said, "I'm tired of you black nigger disrespecting my house."  She told Chad to leave "the mother fuckers" alone because she was going to kill them.

Forstein, Chad, and Chad's friend Keith Hodges went to Edna Jean Finch's house after the September 20 confrontation with Frazier.  Morris, LaMarr's older brother, ran up to the door.  Frazier, Morris's mother, stopped him from trying to get inside saying "it's not worth it."  Forstein asked Chad to get the phone and call someone.  The line was busy the first time he tried to reach his

2

father, but he tried again.  Chad dialed the number and handed the phone to Forstein.  Hodges overheard part of the conversation in which Forstein stated: "I got a job for you, come here as soon as possible, I need you to get rid of these two black niggers . . . ."

Frazier saw Forstein leave the complex 45 minutes or an hour after the confrontation.  Forstein returned 20 minutes later, and pulled into her driveway.  At that point, Howard Morris, Sr., young Morris's father, pulled up and got out of his car.  He spoke with Forstein for a few minutes, and drove away with LaMarr.  Forstein followed them out of the complex.  Robert Price, the security guard, overheard Forstein tell Howard Morris, Sr., "[T]hat's okay, I get my fellows to come down here and teach you niggers something."  She also said, "I'm going to have one-eyed Willie come over and kill a bunch of you mothers."

Forstein and Chad went to San Francisco that night, and stayed with Howard for two days.  They returned to Sacramento on Wednesday, September 22.  Accompanying them in a separate car were Howard, and his driver, defendant James Stringer, who was a skip tracer in the bail bond business.  Both Howard and Stringer were armed.

Upon arriving at Franklin Villa, Forstein went to check her mail near where LaMarr was sitting.  She walked up to LaMarr, grabbed him by the head, and said, "[L]ook what [you got yourself] into."  Around the same time, Forstein warned Finch and her son Donny that she had her people with her and things were going to "come down."

Shortly thereafter, Howard and Stringer got out of their car and approached LaMarr.  One of the men showed the boy a badge, and patted him down.  Both Howard and Stringer pointed their guns at LaMarr, and one stuck a gun in the 13-year-old's side.  Howard told LaMarr he was going to kick in his teeth.  LaMarr started to walk away.  Stringer grabbed him and smashed his hand against the mailbox, breaking two bones.

Forstein, Howard, Stringer, and Chad ended up at Forstein's apartment.  Forstein cleaned up the mess the dog left in their absence.  Chad and Stringer began playing Play Station.  Howard brought the guns from the car, put one under the mattress, kept the other gun with him, and went back outside.

Meanwhile, LaMarr ran to Shirley Hamilton's apartment and called 911.  He told the dispatcher that two men had threatened to arrest him and said they were coming to get his father and brother. LaMarr went back outside to wait for an officer to arrive.  One police car drove up, but immediately left to take another call.  At that moment Morris walked up with two friends.  Morris was 5 feet 11 inches tall, and weighed 207 pounds.  After hearing what had

happened, Morris went inside Hamilton's apartment and called his mother. He then went to his own house, grabbed a metal baseball bat, and headed for the door. LaMarr and the two other young men tried to block his way, but Morris left through an open window. One witness heard Morris yell for Chad to come out with his dog and nunchaks.[1]

There was conflicting testimony about the baseball bat. However, the witnesses generally agreed Morris had nothing in his hands when he walked toward Howard. The older man pulled out his gun and pointed it at Morris. Morris held up his hands with his palms and began backing up. Howard fired from a short distance away, and Morris fell to the ground. Howard fired a second and fatal shot at Morris's head.

Howard reloaded his gun, and warned members of the gathering crowd not to approach the victim. Shortly thereafter, he surrendered peacefully to police officers. Officer Michael Galipeau recounted that Howard stated as he approached, "[P]eople need to be getting killed on this corner trying to hurt my son, all these people need to get a life." Later at the police station, Galipeau asked Howard whether he had any sharp objects in his pockets. Howard said he did not, and continued, "I would not want to hurt you, you have done nothing to me, I did what I came here to do and I'm done."

At trial, Howard testified in his own defense. He admitted taking the gun with him when he left Forstein's house, and intentionally firing the shot that killed Morris. However, he also stated, "I was afraid because he wanted to catch me to take my gun, and if he take my gun he going to kill me and Chad." The defense introduced expert testimony that defendant suffered a stroke in 1996 which resulted in dementia.

_____

[1] The court admitted the testimony of Munoz only as to Forstein.

Answer, Ex. B at 4-8.

The Court of Appeal affirmed petitioner's convictions and sentences on October 1, 2002. Id. at 1, 50. The Court of Appeal modified its original opinion on October 30, 2002 with the same result. Answer, Ex. C at 6. Petitioner sought review of the Court of Appeal's

_____

[1]  The court understands that "nunchaks" in this context refers to the martial arts weapon consisting of two wooden dowels approximately a foot or so in length connected by a chain or rope.

1   decision in the California Supreme Court.  Answer, Ex. D at 2.  His request for review was

2   denied.  Id. at 1.  The claims presented in this action were raised by petitioner before the Court of

3   Appeal and the California Supreme Court on direct review.  Pet. at I; Answer, Ex. A at 3-4;

4   Answer, Ex. D at 3.

5   II.  Standard For Habeas Relief

6                An application for a writ of habeas corpus by a person in custody under a

7   judgment of a state court can be granted only for violations of the Constitution or laws of the

8   United States.  28 U.S.C. § 2254(a).  Also, federal habeas corpus relief is not available for any

9   claim decided on the merits in state court proceedings unless the state court's adjudication of the

10  claim:

11              (1) resulted in a decision that was contrary to, or involved an
            unreasonable application of, clearly established federal law, as
12          determined by the Supreme Court of the United States; or

13              (2) resulted in a decision that was based on an unreasonable
            determination of the facts in light of the evidence presented in the
14          State court proceeding.

15   28 U.S.C. § 2254(d) (referenced herein in as "§ 2254(d)" or "AEDPA").  See Ramirez v. Castro,

16  365 F.3d 755, 773-775 (9th Cir. 2004) (Ninth Circuit affirmed lower court's grant of habeas

17  relief under 28 U.S.C. § 2254 after determining that petitioner was in custody in violation of his

18  Eighth Amendment rights and that § 2254(d) does not preclude relief).  See also Lockyer v.

19  Andrade, 538 U.S. 63, 70-71 (2003) (Supreme Court found relief precluded under § 2254(d) and

20  therefore did not address the merits of petitioner's Eighth Amendment claim).[2]  Courts are not

21  required to address the merits of a particular claim, but may simply deny a habeas application on

22

23          [2]  In Bell v. Jarvis, 236 F.3d 149, 162 (4th Cir. 2000), the Fourth Circuit Court of appeal
        held in a § 2254 action that "any independent opinions we offer on the merits of constitutional
24      claims will have no determinative effect in the case before us . . .  At best, it is constitutional
        dicta."  However, to the extent Bell stands for the proposition that a § 2254 petitioner may obtain
        relief simply by showing that § 2254(d) does not preclude his claim, the Fourth Circuit has erred.
25      Title 28 U.S.C. § 2254(a) still requires that a habeas petitioner show that he is in custody in
        violation of the Constitution before he or she may obtain habeas relief.  See Lockyer, 538 U.S. at
26      70-71; Ramirez, 365 F.3d at 773-75.

1  the ground that relief is precluded by 28 U.S.C. § 2254(d).  Lockyer, 538 U.S. at 71 (overruling

2  Van Tran v. Lindsey, 212 F.3d 1143, 1154-55 (9th Cir. 2003), in which the Ninth Circuit

3  required district courts to review state court decisions for error before determining whether relief

4  is precluded by § 2254(d)).  It is the habeas petitioner's burden to show that he is not precluded

5  from obtaining relief by § 2254(d).  See Woodford v. Visciotti, 537 U.S. 19, 25 (2002).

6          The "contrary to" and "unreasonable application" clauses of § 2254(d)(1)  are

7  different.  As the Supreme Court has explained:

8              A federal habeas court may issue the writ under the "contrary to"
             clause if the state court applies a rule different from the governing
9              law set forth in our cases, or if it decides a case differently than we
             have done on a set of materially indistinguishable facts.  The court
10             may grant relief under the "unreasonable application" clause if the
             state court correctly identifies the governing legal principle from
11             our decisions but unreasonably applies it to the facts of the
             particular case.  The focus of the latter inquiry is on whether the
12             state court's application of clearly established federal law is
             objectively unreasonable, and we stressed in Williams [v. Taylor,
13             529 U.S. 362 (2000)] that an unreasonable application is different
             from an incorrect one.

14

15  Bell v. Cone, 535 U.S. 685, 694 (2002).  A state court does not apply a rule different from the

16  law set forth in Supreme Court cases, or unreasonably apply such law if the state court simply

17  fails to cite or fails indicate an awareness of federal law.  Early v. Packer, 537 U.S. 3, 8 (2003).

18          The court will look to the last reasoned state court decision in determining

19  whether the law applied to a particular claim by the state courts was contrary to the law set forth

20  in the cases of the United States Supreme Court or whether an unreasonable application of such

21  law has occurred.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002), cert. dismissed, 538 U.S.

22  919 (2003).  Where the state court fails to give any reasoning whatsoever in support of the denial

23  of a claim arising under Constitutional or federal law, the Ninth Circuit has held that this court

24  must perform and "independent review of the record to ascertain whether the state court decision

25  was objectively unreasonable.  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  In other

26  /////

6

1  words, the court assumes the state-court applied the correct law, and analyzes whether the

2  decision of the state court was based on an objectively unreasonable application of that law.

3          It is appropriate to look to lower federal court decisions to determine what law

4  has been "clearly established" by the Supreme Court and the reasonableness of a particular

5  application of that law.  See Duhaime v. Ducharme, 200 F.3d 597, 598 (9th Cir. 2000).

6  III.  Arguments And Analysis

7          A.  Hearsay

8          Petitioner's first argument is that his Constitutional right to confront witnesses

9  against him was violated by the admission into evidence of out of court statements made by

10  Cherie Forstein.  Pet. at 20-29.  The statements challenged are recordings of telephone messages

11  left by Ms. Forstein on petitioner's answering machine.[3]  As noted above, the messages were left

12  on petitioner's answering machine on September 7, 8 and 9, 1999.  The California Court of

13  Appeal, the highest and last court to issue a reasoned opinion with respect to petitioner's

14  Constitutional claim, addressed the claims as follows:

15          "'The central concern of the Confrontation Clause is to ensure the
          reliability of the evidence against a criminal defendant by
16          subjecting it to rigorous testing in the context of an adversary
          proceeding before the trier of fact.' [Citation.]" (Lilly v. Virginia
17          (1999) 527 U.S. 116, 123-124 [144 L.Ed.2d 117, 126] (Lilly).)
          "[T]he veracity of hearsay statements is sufficiently dependable to
18          allow the untested admission of such statements against an accused
          when (1) 'the evidence falls within a firmly rooted hearsay
19          exception' or (2) it contains 'particularized guarantees of
          trustworthiness' such that adversarial testing would be expected to
20          add little, if anything, to the statements' reliability."  (Lilly, supra,
          at pp. 124-125 [144 L.Ed.2d at p. 127, emphasis added, quoting
21          Ohio v. Roberts (1980) 448 U.S. 56, 66 [65 L.Ed.2d 597, 608]
          (Roberts).)
22
          A hearsay exception is firmly rooted 'if, in light of 'longstanding
23          judicial and legislative experience,' [citation] it 'rest[s] [on] such
          [a] solid foundatio[n] that admission of virtually any evidence
24

25  _____
          [3]  A transcript of the recordings can be found between pages 470 and 484 of the Clerk's
26  Transcript prepared for direct appeal or in exhibit A to petitioner's habeas application between
  pages 490 and 504.

7

1   within [it] comports with the "substance of the constitutional
2   protection."' [Citations.]  This standard is designed to allow the
    introduction of statements falling within a category of hearsay
    whose conditions have proven over time 'to remove all temptation
3   to falsehood, and to enforce as strict an adherence to the truth as
    would the obligation of an oath' and cross-examination at trial.
4   [Citation.]" (*Lilly, supra*, 527 U.S. at p. 126 [144 L.Ed.2d at pp.
    127-128].)  "[W]hether the statements fall within a firmly rooted
5   hearsay exception for Confrontation Clause purposes is a question
    of federal law."  (*Id*. at p. 125 [144 L.Ed.2d at p. 127].)  If, as in
6   *Lilly*, the proferred statement is inherently unreliable and falls
    outside a firmly rooted hearsay exception, the prosecution must
7   satisfy the second prong of the *Roberts* test in order to introduce
    the statements.  (*Lilly, supra*, at pp. 131, 134 [144 L.Ed.2d at pp.
8   131, 132-133].)

9   The Evidence Code section 1250 state-of-mind exception to the
    hearsay rule is firmly rooted in California's decisional and
10  statutory law.  (See Assem. Com. on Judiciary com., 29B West's
    Ann. Evid. Code (1995 ed.) foll § 1250, pp. 280-281; *People v.
11  Alcalde* (1944) 24 Cal.2d 177; see also *People v. Morales* (1989)
    48 Cal.3d 527, 552 (*Morales*).)  Included within this hearsay
12  exception are statements offered to show the declarant's intent to
    do a future act, such as draw others into a plot to rob a restaurant
13  or to commit murder.  (*People v. Sanders* (1995) 11 Cal.4th 475,
    518 (*Sanders); Morales, supra*, at p. 552.)  Statements within this
14  exception are admissible against confederates as well as
    declarants.  (*Sanders, supra,* at pp. 515, 518*; Morales, supra*, at
15  pp. 551-552; *People v. Han* (2000) 78 Cal.App.4th 797, 806.)

16  We independently review the trial court's ruling on this "fact-
    intensive, mixed question [] of constitutional law" (*Lilly, supra*,
17  527 U.S. at p. 136 [144 L.Ed.2d at p. 134]), and conclude it
    properly found that Forstein's statements fell within the Evidence
18  Code section 1250 state-of-mind exception to the hearsay rule.
    The taped telephone messages showed Forstein's fear of her
19  neighbors, concern for Chad's safety, and anger at Howard for not
    paying her the money she said he owed.  The remaining statements
20  reveal Forstein's intent to bring Howard and his confederates from
    San Francisco to kill LaMarr and his family.  Her warnings to the
21  Finches show knowledge of what was about to happen.

22  Answer, Ex. B at 25-27.

23          The Confrontation Clause of the Sixth Amendment provides:  "In all criminal

24  prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against

25  him."  In <u>Crawford v. Washington</u>, 541 U.S. 36, 53-54 (2004), the Supreme Court held that this

26  provision bars "admission of testimonial statements of a witness who did not appear at trial

1  unless [s]he was unavailable to testify, and the defendant had had a prior opportunity for cross-

2  examination."  In Davis v. Washington, 126 S. Ct. 2266 (2006), the Court noted with respect to

3  the Crawford decision:

4  > A critical portion of this holding . . . is the phrase 'testimonial
   > statements.'  Only statements of this sort cause the declarant to be

5  > a 'witness' within the meaning of the Confrontation Clause."
   > [Citation omitted.] It is the testimonial character of the statement

6  > that separates it from other hearsay that, while subject to
   > traditional limitations upon hearsay evidence, is not subject to the

7  > Confrontation Clause.

8  Davis, 126 S. Ct. at 2273.

9  > In Crawford, the Court discussed what constitute "testimonial statements:"

10 > Testimony . . . is typically a solemn declaration or affirmation
   > made for the purpose of establishing or proving some fact.

11 > [Internal quotations and citation omitted.] An accuser who makes a
   > formal statement to government officers bears testimony in a sense

12 > that a person who makes a casual remark to an acquaintance does
   > not.

13

14 Crawford, 541 U.S. at 51.  In Davis, the court added that one testifies out of court when he or she

15 acts like a witness.  Davis, 126 S. Ct. at 2277.  In other words, the determinative question to ask

16 is whether the out of court statement is "a weaker substitute for live testimony at trial." [Internal

17 quotations omitted.]  Id.

18         While the contours of what constitutes "testimonial statements" under Supreme

19 Court precedent at this point have not been precisely demarcated, the messages left by Cherie

20 Forstein are not testimonial statements.  Ms. Forstein was not acting "like a witness" in relaying

21 information regarding this case to a governmental official.  She was simply communicating with

22 petitioner.  Cf. United States v. Allen, 425 F.3d 1231, 1235 (9th Cir. 2005), cert. denied, ___

23 U.S. ___, 126 S. Ct. 1487 (2006) (out of court statements from one co-conspirator to another not

24 "testimonial").  In light of Crawford and Davis, the court must reject petitioner's Confrontation

25 Clause claim.

26 /////

1    B.  Picture of Victim

2        Petitioner's second argument is that he was denied his right to a fair trial by the

3    presentation of a picture of Howard Morris, the victim.  Pet. at 29-30.  Petitioner asserts that in

4    the picture, People's Exhibit Number 3,  Mr. Morris appears shorter than his little brother

5    LaMarr.  Id. at 29. Petitioner asserts this damaged his case because he had tried to convince

6    jurors that he was afraid of Mr. Morris due to his size.  Id. at 29-30.  Petitioner also asserts that

7    Mr. Morris appears effeminate in the picture because he is wearing shorts and a long sweater

8    resembling a smock.  Id. at 29.[4]

9        The California Court of Appeal found that admission of the picture was not

10   improper.  Answer, Ex. B at 32-33.

11       The admission of photographs can violate the Due Process Clause of the

12   Fourteenth Amendment if the images are "of such quality as necessarily prevents a fair trial."

13   Hovey v. Ayers, 458 F.3d 892, 923 (9th Cir. 2006).  Even if there are no permissible inferences

14   to be drawn from a picture, a defendant's due process right to a fair trial has not necessarily been

15   violated by the picture's admission.  Id.

16       Petitioner's right to a fair trial was not violated even if Mr. Morris's appearance

17   in People's Exhibit 3 made him appear sympathetic.  The Ninth Circuit Court of Appeals has

18   found that admission into evidence of more inflammatory material did not violate due process.

19   See, e.g., Batchelor v. Cupp, 693 F.2d 859, 865 (9th Cir. 1982) (prejudice associated with

20   pictures of victim's dead body did not violate the defendants' due process right to a fair trial).

21   Furthermore, the picture did not violate due process on the theory that the picture did not

22   adequately convey the size of Howard Morris.  During trial, a pathologist testified that, at the

23   time of his death, Mr. Morris weighed 207 pounds and was 5'11".  RT 993:5-23.  This testimony

24   provided a basis for the jury's resolving any ambiguity created by the picture as to Mr. Morris's

25

26       [4] Neither party has submitted People's Exhibit 3 to this court.

1  size.  The admission of the picture did not violate federal law.  Petitioner's second claim also

2  must be rejected.

3  IV.  Conclusion

4          For all the foregoing reasons the court will recommend that petitioner's

5  application for writ of habeas corpus be denied.

6          In accordance with the above IT IS HEREBY RECOMMENDED that petitioner's

7  application for writ of habeas corpus be denied.

8          These findings and recommendations are submitted to the United States District

9  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

10  days after being served with these findings and recommendations, any party may file written

11  objections with the court and serve a copy on all parties.  Such a document should be captioned

12  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

13  shall be served and filed within ten days after service of the objections.  The parties are advised

14  that failure to file objections within the specified time may waive the right to appeal the District

15  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

16  DATED: March 14, 2007.

17

18                                     U.S. MAGISTRATE JUDGE

19

20  1
    howa0083.157

21

22

23

24

25

26